UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Lisa Campagna,

    Plaintiff,

v.                                                            Case No. 10-10806

Benco Dental Supply, Inc.,                    Honorable Sean F. Cox

    Defendant.
_____/

**OPINION & ORDER
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff filed this action against her former employer asserting that she was terminated because of her gender, in violation of Title VII and Michigan's Elliot-Larsen Civil Rights Act. The matter is currently before the Court on Defendant's Motion for Summary Judgment. The parties have briefed the issues and the Court heard oral argument on April 14, 2011. For the reasons below, the Court shall DENY the motion.

BACKGROUND

Plaintiff Lisa Campagna ("Plaintiff" or "Campagna") filed this action against Defendant Benco Dental Supply, Inc. ("Defendant" or "Benco") on February 26, 2010. Her complaint asserts two counts: "Violation of Title VII of the Civil Rights Act, Gender Discrimination" (Count I); and "Violation of the Elliott-Larsen Civil Rights Act, Gender Discrimination" (Count II).

Following discovery, Defendant filed the instant motion for summary judgment. This Court's practice guidelines for motions for summary judgment provide, in pertinent part,

that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

Both parties complied with the Court's practice guidelines for motions for summary judgment such that: 1) along with Defendant's Motion for Summary Judgment, Defendant filed a "Statement of Material Facts Not In Dispute" ("Def.'s Stmt.") and 2) along with Plaintiff's Response, Plaintiff filed her "Counter Statement of Disputed Facts" (Pl.'s Stmt.").

The following reflects the evidence submitted by the parties, taken in the light most favorable to Plaintiff.

Plaintiff began working for Defendant on January 28, 2002. Pennsylvania-based Defendant Benco "hired Plaintiff as a Territory Representative ("TR") to sell dental equipment and supplies in its Great Lakes Region (Michigan/northern Ohio)." (Def.'s Stmt. at ¶ 1; Pl.'s Stmt. at ¶ 1).

From 2002 to 2007, Plaintiff reported to Regional Manager Todd Mears ("Mears"). (Pl.'s Dep. at 51). Mears worked closely with Plaintiff and coached her to improve her sales

presentation and prospecting. Typically, Mears would spend a day co-traveling and making sales calls with Plaintiff once a month. (Pl.'s Affidavit at ¶ 3).

A "co-travel" refers to a supervisor accompanying a TR on his or her sales calls for the day, traveling from office to office with them, coaching them and providing feedback. (Klavon Dep. at 55).

In 2004, Mears placed Plaintiff on probation, noting that she had "struggled with personal and family issues that have unfortunately had an adverse effect on her performance in her territory." (Def.'s Ex. 6). Mears further noted:

> The result of her ineffective performance has lead Lisa to be currently working under probation. Her future is now entirely in her hands and she has a limited amount of time to prove that she can keep her position. With that being said, I feel that Lisa is someone who should not be underestimated if she makes her mind up to do something. I have seen a vast improvement in Lisa's attitude over the past two months, while also improving her organizational skills. . . I hired Lisa because I believed she had what it takes to be a successful territory rep and I will continue to stand behind her and my decision. I can only hope that Lisa is willing to make the sacrifices necessary to succeed in her position, nothing less than 110% will be acceptable. I'll know by the end of March.

(*Id.*). Plaintiff successfully emerged from that probation status.

After having been on probation in 2004, Mears gave Plaintiff two positive performance evaluations. (Pl.'s Affidavit at ¶ 4).

For example, in Plaintiff's written performance evaluation for 2006, she was given an overall rating of "meets expectations." Plaintiff was given ratings of "exceeds expectations" in two categories and the comments about Plaintiff included: "Lisa has made nice improvement in her sales this year, exceeding her success plan goals the first nine months of this year. Lisa has done a good job growing new business and expanding existing." (Ex. 6 to Pl.'s Br.). In the

"evaluator's summary" portion of the review, Mears stated: "Great year in sales growth and promoting focus plus and benco brand products. Much improvement in selling skills. Should continue to work on improvement for continue growth next year." (*Id.*).

After her 2006 evaluation, Mears did not express to Plaintiff that her performance was declining or unsatisfactory at any time in 2007. (Pl.'s Affidavit at ¶ 4).

Plaintiff testified that she did not receive an annual performance review in 2007. (Pl.'s Dep. at 60).

In or around September 2007, Benco divided the Great Lakes Region into two regions. Western Michigan became one region and retained the name Great Lakes Region; eastern Michigan/northern Ohio became the Motown Region. (Def.'s Stmt. at ¶ 3; Pl.'s Stmt. at ¶ 3). Mears remained the Regional Manager of the Great Lakes Region. Defendant hired John Klavon ("Klavon") as the Regional Manager for the Motown Region. (Def.'s Stmt. at ¶¶ 4-5; Pl.'s Stmt. at ¶¶ 4-5).

At the time it was formed, the Motown Region had 8 territory representatives, including Plaintiff. (Def.'s Stmt. at ¶ 6; Pl.'s Stmt. at ¶ 6).

In early November of 2007, Klavon accompanied Plaintiff on one sales call to Dr. Parmater and Dr. Hall. (Pl.'s Affidavit at ¶ 6). After that call, Klavon discussed with Plaintiff ways that she could become better organized. (*Id.*). Klavon also completed a form regarding that sales call, giving Plaintiff an overall rating of "partially meets expectations." (Ex. 7 to Def.'s Br.).

Robert Bishop ("Bishop") was a sales person who was working as a TR at one of Benco's competitors. (Klavon Dep. at 78). Klavon testified that he called Klavon and tried to recruit him

4

to Benco. (*Id*.). In August of 2008, Klavon hired Bishop as a TR in the Motown Region.

In August 2008, Plaintiff invited Klavon to attend a "lunch and learn"[1] with her and a relatively new client, Dr. Perkins. (Pl.'s Affidavit; Pl.'s Dep. at 85-88). Plaintiff testified that Klavon arrived to the lunch a half hour late and that the client placed a $1,200 order and bought a $3,000 piece of equipment before Klavon arrived. (*Id*.). Plaintiff testified that after that lunch, Klavon took her to a nearby restaurant and put her on probation. (*Id*.; *see also* Klaxton Dep. at 127).

Plaintiff states that "just a week before I was placed on probation, I was told that Rob Bishop, who had been employed as a sales representative for a competitor, was being hired by Benco and would be given 15 of my accounts. I was not assigned any new customers or accounts to make up for the loss of the business to Bishop." (Pl.'s Affidavit at ¶ 15).

Klaxton testified that he does not recall taking accounts from any other TR's other than Plaintiff in order to assign them to Bishop. (Klaxton Dep. at 105). Klaxton acknowledged that the accounts reassigned to Bishop would result in Plaintiff's sales declining by $280,000 annually. (Ex. 12 to Pl.'s Br.). In addition, because one of Plaintiff's larger accounts, Sunrise Dental, was sold and the new owner was located in Saginaw, Klaxton reassigned that case to another TR, Phillip Cole. (Pl.'s Affidavit at ¶ 16). Despite taking those accounts away from Plaintiff, Klaxton did not adjust Plaintiff's annual sales goals. (Klaxton Dep. at 101-04).

On August 18, 2008, Klavon completed a form regarding the lunch and learn with Dr. Perkins and gave Plaintiff an overall rating of "partially meets expectations." (Ex. 8 to Def.'s

---

[1] A "lunch and learn" is typically an hour-long lunch where a TR talks about Benco and the Benco difference and how its sets itself apart from its competitors. (Pl.'s Dep. at 86).

Br.). Although he had already placed Plaintiff on probation, later that same night, Klavon sent an e-mail to Gable and Mitch Huber, describing the lunch and learn and recommending that Plaintiff be placed on probation. (Ex. 9 to Def.'s Br.; Def.'s Br. at 3).

On September 3, 2008, Klaxton sent Plaintiff an e-mail detailing the reasons he had given her for placing her on probation. (Ex. 12 to Def.'s Br.; Def.'s Stmt. at ¶ 21; Pl.'s Stmt. at ¶ 21). Attached to that e-mail was a spreadsheet that Klaxton asked Plaintiff to complete and return to him each week. Klaxton also stated they would discuss the outcomes weekly. (*Id.*). Plaintiff states that she "prepared those weekly reports on an Excel spreadsheet and emailed them to Mr. Klaxton using the company Lotus Notes system every Friday evening." (Pl.'s Affidavit at ¶ 10). Plaintiff further states that she requested a read receipt with each report and, based on those receipts, Klaxton often did not open her e-mails for weeks. (*Id.*).

After receiving Klaxton's September 3, 2008 e-mail, Plaintiff sent Klaxton a written response, and copied Gable and Huber on it, stating that some of Klaxton's statements were inaccurate. (Ex. 10 to Pl.'s Br.). Plaintiff states that neither Klaxton, nor Gable or Huber, discussed any of her concerns with her. (Pl.'s Affidavit at ¶ 9).

Plaintiff states that while she was on probation Klaxton "never contacted me by email, telephone or in person to follow-up or otherwise coach me during the probation. I sent him several emails and also called to ask for coaching and co-travel opportunities but he never responded." (*Id*. at ¶ 12).

Defendant terminated Plaintiff's employment on October 27, 2008. Defendant contends that Plaintiff was terminated for poor performance.

Standard Of Decision:

Summary judgment is proper when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

At the summary judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail on her discrimination claims. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).

Here, Plaintiff does not contend that any direct evidence supports her gender discrimination claims. She must therefore rely on circumstantial evidence.

A.  Plaintiff Has Established A Question Of Fact As To Whether She Can Establish A Prima Facie Case Of Gender Discrimination.

Under the circumstantial evidence approach, a plaintiff must show the existence of facts which create an inference of discrimination under the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Both parties acknowledge that the *McDonnell Douglas* framework is applied to Plaintiffs ELCRA and Title VII claims and that Plaintiff bears the burden of establishing a prima facie case. They also agree that in order establish a prima facie case of age discrimination, Plaintiff must establish that: 1) she is a member of the protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position he held, and 4) she was replaced by a person outside of the

protected class or that similarly situated non-protected employees were treated more favorably.

It is undisputed that Plaintiff has established the first three elements. Defendant contends that Plaintiff cannot establish a prima facie case because she cannot establish the fourth element – that she was replaced by a person outside of the protected class or that similarly situated non-protected employees were treated more favorably.

        1.       <u>There Is A Genuine Issue Of Material Fact As To Whether Plaintiff Replaced By A Male.</u>

Plaintiff contends that she was "replaced by Robert Bishop, who was hired in August 2008 by John Klavon despite the fact that there was no open position in the region. Immediately upon hiring Bishop, Klavon gave him 15 of Plaintiff's accounts and then put her on probation. Two months later, Plaintiff was fired and Bishop remained employed" in the Motown Region. (Pl.'s Br. at 13).

Defendant contends that Bishop did not replace Plaintiff because he was hired a few months before Plaintiff was fired. Defendant also asserts that after Plaintiff's termination "her accounts did not go only to Bishop." (Def.'s Br. at 8). Defendant contends that her accounts were distributed among three different TR's. In support of that assertion, Defendant attaches a spreadsheet as Exhibit 16. Moreover, the spreadsheet lists 26 accounts as assigned to Bishop under the column titled "TR Assigned," and then appears to identify other accounts under a column titled "Yet to be Assigned." In addition, 24 of those accounts have the name Bishop in the "Yet to be Assigned" column.

Viewing the evidence presented in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could conclude that Plaintiff was replaced by Bishop. Klaxton

hired Bishop although there were no open positions in the Motown Region.  Moreover, upon hiring Bishop, Klaxton reassigned 15 of Plaintiff's established accounts to Plaintiff and then, a week later, placed Plaintiff on probation.  Klaxton testified that he does not recall taking accounts away from any other TR's other than Plaintiff in order to assign them to Bishop.  (Klaxton Dep. at 105).  Notably, after terminating Plaintiff, Defendant did not hire another TR in the Motown Region.  Defendant kept Bishop and assigned him more of Plaintiff's accounts.

      2.      There Is Also A Genuine Issue Of Material Fact As To Whether Similarly-Situated, Non-Protected Employees Were Treated More Favorably.

Plaintiff also asserts that she can establish the fourth element because similarly situated male TR's were treated more favorably.  Plaintiff contends several male TR's (Blakeslee, Boehm, Cole and Melching) did not meet their sales goals for 2008 but were not put on probation or terminated.  She also asserts that Bishop was treated more favorably in that he was allowed to use a secretary to process his orders while Plaintiff had to send in her own orders.

Plaintiff also asserts that Klaxton treated male TR's more favorably than her in that he co-traveled with them much more frequently than with her.  Attached as Exhibit 8 to Plaintiff's Brief is Defendant's discovery response providing the number of time that Klavon traveled with the TR's he was responsible for supervising during 2007 and 2008.  This data reflects that Klavon co-traveled with Plaintiff, at most,[2] 3 times during this two-year period.  During this same time period, Klaxton co-traveled with male TR's Cole and Melching 10 times each.  In addition, although Bishop was only employed by Benco for 5 months of this two-year period,

---

[2]Plaintiff contends that Klaxton only truly co-traveled with her one time.  She contends the other two instances were occasions where Klaxton accompanied her to a single meeting – not an entire day.

9

Klaxton co-traveled with him 5 times.

The Court concludes that Plaintiff may also meet the fourth element by establishing that Klaxton treated male TR's more favorably than her.

B.      Plaintiff Has Established A Genuine Issue Of Material Fact As To Pretext.

Once a plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the Plaintiff's discharge.

Here, Defendant states that its legitimate, nondiscriminatory reason for terminating Plaintiff is poor performance.

If a defendant articulates a nondiscriminatory reason for the challenged action, the plaintiff bears the ultimate burden to prove by a preponderance of the evidence that the proffered explanation was a pretext for discrimination. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998). Where, as here, a case is at the summary judgment stage, a plaintiff seeking to prove discrimination via indirect evidence must submit sufficient evidence from which a reasonable jury could conclude that the defendant's legitimate, nondiscriminatory reasons for its actions are a pretext for unlawful discrimination. *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007).

A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment act by showing that the proffered reason 1) had no basis in fact, 2) did not actually motivate the defendant's challenged conduct, or 3) was insufficient to warrant the challenged conduct. *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003); *Manzer*, 29 F.3d at 1084. The first type of showing consists of evidence that the proffered bases for the termination never happened (*i.e.*, that they are factually false). With respect to the second

kind of showing, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id*. The third showing consists of evidence that other employees, particularly those not in the protected class, were not fired even though they engaged in similar conduct. *Id*.

In attempting to establish pretext here, Plaintiff relies on the second and third types of showings.

With respect to the second kind of showing, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id*.

Plaintiff's position is that Klaxton hired Bishop to replace her and then put Plaintiff on a "sham probation" and made it impossible for her to emerge from probation by taking accounts away from her without reducing her sales goals and providing her no assistance in improving her performance. Plaintiff has submitted circumstantial evidence to support this position.

As Plaintiff notes, there was not an opening for a TR in the Motown Region when Klaxton hired Bishop. Klaxton did not follow the normal protocol for hiring Bishop. Klaxton testified regarding the hiring process at Benco. If a regional manager believes another TR is needed in his or her region, that regional manager would ask the hiring committee for approval to hire an additional TR. (Klaxton Dep. at 34). In other words, the first step is getting permission to hire for a new position – not a specific person. (*Id*. at 35). If the hiring committee approves the request, they post the position and begin interviewing candidates. Mitch Huber and Benco's Culture and People would also be involved in that process. (*Id*. at 36-37). When Bishop was hired, however, Klaxton simply went to Huber and requested to hire Bishop. (*Id*. at 90-91). No

other candidates were interviewed. (*Id.*).

In addition, a week before he placed Plaintiff on probation, Klaxton took 15 of Plaintiff's established accounts and gave them to Bishop and Plaintiff was not assigned any new customers or accounts to make up for the loss of the business given to Bishop. (Pl.'s Affidavit at ¶ 15). Klaxton testified that he does not recall taking accounts away from any other TR's in order to assign them to Bishop. (Klaxton Dep. at 105). Klaxton acknowledged that the accounts reassigned to Bishop would result in Plaintiff's sales declining by $280,000 annually. (Ex. 12 to Pl.'s Br.). Despite taking those accounts away from Plaintiff, Klaxton did not adjust Plaintiff's annual sales goals:

> Q. I understand that that's what you did. But I'm saying what type of consideration did you give in light of the fact that you are now taking a portion of [Plaintiff's] sales volume and transferring it to another sales or territory representative, what did you do in terms of taking that into consideration in terms of her performance?
>
> A. I didn't do anything about it.

(Klaxton Dep. at 101-104).

In addition, Klaxton did not follow Benco's normal protocol when he placed Plaintiff on probation. George Rable is the Vice President of Culture and People, Benco's human resources department. Rable testified that managers are supposed to contact Culture and People first whenever there is "any kind of a disciplinary matter" and it is "rare that it doesn't happen." (Rable Dep. at 21- 23). The evidence presented by Plaintiff, however, establishes that Klaxon put Plaintiff on probation without following Defendant's normal protocol and that he recommended that Plaintiff be placed on probation after he had already put her on probation.

Plaintiff has submitted additional evidence to support her theory that her probation was a

sham.

The stated goal of Benco's associate counseling process, also referred to as a probationary policy, is to get the employee back on track and continuing in their employment. (Rable Dep. at 23-25). When a TR is on probation, the Regional Manager is supposed to advise that employee, to meet with them, and to work on the plan of improvement. (*Id*. at 47).

As part of her probation, Plaintiff was asked to provide Klaxton with a weekly report and Klaxton stated that they would discuss the outcomes weekly. Plaintiff's Affidavit states that she "prepared those weekly reports on an Excel spreadsheet and emailed them to Mr. Klaxton using the company Lotus Notes system every Friday evening." (Pl.'s Affidavit at ¶ 10). Plaintiff further states that she requested a "read receipt" with each report and, based on those receipts, Klaxton often did not open her e-mails for weeks. (*Id.*). Plaintiff further states that while she was on probation Klaxton "never contacted me by email, telephone or in person to follow-up or otherwise coach me during the probation. I sent him several emails and also called to ask for coaching and co-travel opportunities but he never responded." (*Id*. at ¶ 12).

Plaintiff also asserts that Klaxton treated male TR's more favorably than her in that he co-traveled with them much more than with her. As stated earlier, the evidence presented by Plaintiff supports her assertion that Klaxton co-traveled with males more frequently.

The third showing consists of evidence that other employees, particularly those not in the protected class, were not fired even though they engage in similar conduct.

Plaintiff contends that the "same standards were not applied to the male sales representatives with lower sales volumes or who missed their sales goals by high percentages." That is, Plaintiff contends that she was terminated while Defendant did not terminate two male

13

representatives who had the same issues with sales volumes or missing sales goals, Bishop and Melching.

Defendant concedes that "[a]s of September/October 2008, Plaintiff might have been 'neck and neck' with Bishop and Melching," but Defendant contends those employees are not similarly situated to Plaintiff because they were in their first year of employment with Benco. (Def.'s Br. at12).

However, a Plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two be considered similarly situated. Rather, the plaintiff and the employees with whom the plaintiff seeks to compare himself or herself must be similar "in all relevant respects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Courts should make an "independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id.*

Plaintiff has submitted evidence to establish that while Melching and Bishop were only employed by Defendant for a year, they both had prior experience in dental sales before coming to Defendant. (*See* Ex. 20 to Pl.'s Br.). Indeed, Klaxton testified that Bishop was hired because he was a successful dental salesperson with one of Benco's competitors and was expected to bring a million dollar book of business with him. (Klaxton Dep. at 77-80). Bishop's established sales relationships while working for the competitor was Klaxton's stated reason for taking away 15 of Plaintiff's accounts and giving them to Bishop when he started at Benco.

Moreover, as Plaintiff notes, Benco adjusted for the different levels of experience of each sales person in setting the sales goals for each TR. (Pl.'s Br. at 19). Plaintiff asserts that because

the TRs had individualized sales goals, they are all similarly situated and comparable for judging how they performed against that goal.

The Court agrees that, under the circumstances presented here, Bishop and Melching can be deemed similarly situated.

Based on all of the above, the Court concludes that Plaintiff has submitted sufficient evidence of pretext to survive summary judgment.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

                                                                              S/Sean F. Cox
                                                                              Sean F. Cox
                                                                              United States District Judge

Dated: April 20, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 20, 2011, by electronic and/or ordinary mail.

                                                                              S/Jennifer Hernandez
                                                                              Case Manager